**THIBAUT et al. v. GIBSON et al.**

**Civ. A. No. 351.**

United States District Court
E. D. Louisiana, Baton Rouge Division.

Sept. 7, 1949.

Appeal Dismissed April 21, 1950.
See 181 F.2d 494.

Durrett & Hardin, Kermit B. Guidroz, Baton Rouge, La., for plaintiff.

William A. Porteous, Jr., and Robert L. A. Indest, New Orleans, La., for defendant.

CHRISTENBERRY, District Judge.

This is a suit for damages brought by the widow of Joseph L. Thibaut, on her own behalf and on behalf of her minor children, Thibaut having been killed when his automobile ran into the rear end of a disabled truck and trailer belonging to defendant's assured. The case was tried at Baton Rouge, Louisiana, on November 25 and 26, 1946. A verdict was returned in favor of Mrs. Thibaut in the sum of $5,000, and in favor of the two minor children in the sum of $2,500 each. Motion for a new trial was denied. On December 5, 1946, an appeal was taken to the Court of Appeals for the Fifth Circuit. That Court, on May 23, 1947, found that the verdict of the jury was not supported by the evidence, and that defendant's motion for a directed verdict should have been granted. The judgment was accordingly reversed.

On June 25, 1947, on petition for rehearing, the Court of Appeals withdrew the last paragraph of its opinion, and substituted therefor the following:

"The verdict of the jury is not supported by the evidence in this record. The judgment is reversed and the cause is remanded with directions that judgment be entered for the defendant unless on a pre-trial hearing the plaintiff can show that other evidence is available which might reasonably change the result, in which event a new trial may be granted.

"The judgment is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion." Car & General Ins. Corp. v. Thibaut, 161 F.2d 657, 659.

The petition for rehearing was denied.

Plaintiff petitioned the Supreme Court of the United States for writ of certiorari. The petition was granted, and the judgment of the Circuit Court of Appeals was reversed. 332 U.S. 751, 68 S.Ct. 79, 92 L. Ed. 338. Respondent petitioned for rehearing, and moved to stay the mandate pending disposition of the petition for rehearing. The motion to stay was granted. 68 S.Ct. 151.

On November 24, 1947, the Supreme Court granted the petition for rehearing, vacated the order granting certiorari, and the judgment of reversal entered October 13, 1947, and denied the petition for writ of certiorari. 332 U.S. 828, 68 S.Ct. 205, 92 L.Ed. 403.

In compliance with the Circuit Court's mandate, a pre-trial hearing was had before this Court at Baton Rouge, on March 15, 1948, at which time counsel for plaintiff offered and produced certain affidavits. The court ordered that the affidavits be filed, and that counsel for the respective parties file briefs in connection therewith. In compliance with the court's order, the affidavits and briefs were subsequently filed. The matter is now before the court for the purpose of determining whether the additional evidence, if any, furnished by the affidavits, might, on another trial, reasonably change the result reached by the Circuit Court of Appeals for the Fifth Circuit.

The affidavits filed by plaintiff are by Walter J. Urban, Leslie Bourque, Lawrence Lambert, George Walker, and Mrs. Wright Gautreaux. All of these persons except the last named gave testimony on the trial of the case. Urban, the driver of the disabled truck with which plaintiff's intestate collided, gave his testimony by means of interrogatories, which were read to the jury. Bourque, Lambert and Walker testified in person.

Discussing first the affidavit of Walter J. Urban, the truck driver, it appears that this affidavit was obtained by one of plaintiff's counsel on or about August 7, 1947. In it, Urban states that while seated in the cab of his truck, awaiting a mechanic who was to make the necessary repairs, he saw a car with extremely bright headlights approach-

ing from the direction of Baton Rouge; that these headlights blinded him, and that at that instant, or a second or two later, he heard and felt the crash in which Thibaut met his death. This is the only additional evidence advanced by plaintiff to establish that Thibaut was blinded by lights of an approaching automobile.

Examining the interrogatories and Urban's answers thereto, which form a part of the evidence on the trial, we find that in this connection Urban stated that he was watching a car coming toward him; that at that same time he heard a car coming at a high rate of speed, and that suddenly there was a crash at the rear of his trailer. It is significant that he made no statement at the time with respect to his being blinded by the lights of the approaching automobile. It seems indeed strange that a man seated in a vehicle which was not moving, and who hence was under no obligation or necessity to observe the lights of the approaching automobile, should continue to look into those lights to the point of his becoming temporarily blinded by them.

Urban's affidavit is in other respects, as will be hereafter pointed out, so utterly at variance with testimony previously given by him and with what is palpably the truth, that his statements concerning the blinding lights must be viewed with grave suspicion, to say the least. But assuming the statement contained in Urban's affidavit to be correct, and that he was blinded by these lights, this adds nothing to plaintiff's case.

The rule in Louisiana, binding on this court in this case, is "that a motorist is held to have seen an object, which, by the use of ordinary care and prudence, he should have seen in time to avoid running into it, and that the driver of an automobile is guilty of negligence in driving at a rate of speed greater than that in which he could stop within the range of his vision." See Louisiana Power & Light Co. v. Saia, 188 La. 358, 177 So. 238 and 239, and cases there cited. Also Shell Oil Co. v. Slade, 5 Cir., 1943, 133 F.2d 518. As stated by Judge McCord, in the opinion of the Circuit Court in the instant case: "It is the rule that drivers of automobiles must keep their vehicles under such control as to be able to

bring them to a complete stop within the range of their vision, and, at night, within the distance in which their headlights project." Citing Goodwin v. Theriot, La.App., 165 So. 342; Harper v. Holmes, La.App., 189 So. 463.

There is, of course, an exception to the general rule stated above, where there are such unusual circumstances that the failure of the driver to see what is ahead of him may be excused. But the evidence here fails to disclose such unusual circumstances. The accident occurred on a stretch of road which is level and perfectly straight for a distance of five or six miles in either direction from the scene of the accident. Urban, in his affidavit, says he saw the approaching automobile, and that the lights were bright and blinding. If Urban could see this approaching automobile, there is no reason why Thibaut, if he had been keeping proper lookout, could not have done likewise. As the automobile approached and it became apparent that its lights were bright, it became the duty of Thibaut so to reduce the speed of his vehicle as to bring it under complete control, that is to say, to enable him to stop within the range of his vision. That Thibaut did not do this, but, on the contrary, continued on at a high rate of speed until he crashed, is amply established by the evidence.

In his affidavit, Urban also states that a pocket of fog or steam from a well being driven nearby engulfed his truck for about six or eight feet in front, and about twenty feet in the rear. This statement is at complete variance with the testimony given by him by way of interrogatories. In cross-interrogatory No. 64, which was propounded by the plaintiff, he was asked: "Shortly before the accident occurred, and at the time of the accident, was there any fog or mist in the *vicinity* of the accident?" (Emphasis added.)

He answered: "No, it rained after the accident."

He was then asked: "Isn't it a fact that the night was foggy, and that it had been raining before the accident took place?"

His answer to that question was: "No, it rained after the accident."

Urban, in his affidavit, attempts to explain his failure to mention the pocket of fog or steam by stating that he understood the interrogatory to refer to a general fog all the way from New Orleans. This explanation can hardly be considered valid in the light of his negative reply to the question which specifically referred to fog or mist in the vicinity of the accident.

Walker, in his affidavit, which will be discussed in greater detail later, claims to have seen some fog or steam at the scene of the accident. He says, however, "This was not a thick or heavy mist or fog or pocket of steam, but was thin, and I did not really know it was there as I drove along the highway, and did not realize that it was there until after I had almost struck these parked vehicles and had stopped my automobile and gotten out and walked back, and it was then that I noticed this thin mist or fog or steam."

If the fog or steam was so thin that it could not readily be seen, it is difficult to understand how it could have impaired anyone's vision. But, assuming that there was some fog, what has been stated with respect to the duty of Thibaut to bring his automobile under control when confronted with blinding headlights, is equally true as to fog. It is incumbent on plaintiff to show that the presence of such fog constituted such an exceptional circumstance as would excuse Thibaut's failure to see the parked truck and trailer. This she has failed to do. If Thibaut had been driving his automobile at a safe rate of speed, and so that he could bring it to a complete stop within the range of his headlights, traversing as he was a straight stretch of road, he would have seen the fog, and having seen it, he would then have been under the duty to drive with the utmost care and caution and to so reduce his speed as to enable him to stop his vehicle within the range of his lights after entering the pocket of fog. See Shell Oil Co. v. Slade, supra.

It is in connection with the condition of his truck while it was stopped on the highway that Urban, in his affidavit, takes the greatest departure from the testimony given by him by interrogatories, and, it is proper to add, from the truth. The change in his testimony in this respect is nothing short of brazen. In his affidavit, Urban claims that when he had the blow-out which caused the stopping of his truck, one tire on the right side blew away. He states that this happened because the lugs broke, and that there still was one tire and one rim on the wheel when he stopped, so that the trailer was standing on wheels on all sides at the time of the accident. He states further that he did not remove any wheels at any time prior to the accident, but that some time after the accident he assisted the mechanic, Albert P. Hickman, to remove the right wheel when he attempted to fix it.

In his answers to interrogatories which were introduced on the trial of the case, Urban stated that one of the right rear wheels had blown off, and that the other rear right wheel had blown out. In his affidavit, he states that he did not understand that he had so testified, and that what he meant was that one of the tires of the right rear wheel had blown off, and that if the question was asked him he did not understand it. Urban's affidavit in this connection cannot be believed. At the very outset of his examination, that is to say in the 7th interrogatory, he was asked: "If you did not reach your destination with your truck, please state how far you got with your truck and trailer, and why you did not get any further."

Urban's answer was: "Well, I come out of Gonzales about 2½ miles, where I broke down. The trailer was busted, broke down. I put out my flares; walked 2½ miles back to Gonzales, and phoned Mr. Fabacher to send me a *wheel* and tire, and a mechanic out to fix the wheel." (Emphasis added.)

The 12th interrogatory propounded to Urban was: "Did anything happen to any of the tires? If so, what happened?"

His answer was: "The back tires was blowed out,—one of them; the other one we ain't never found yet, of the truck. *One of the wheels came off.* The other tire blew out on the right side. It was all on the right side." (Emphasis added.)

In the 18th cross-interrogatory propounded by plaintiff, Urban was asked: "Isn't it

a fact that while you were driving this equipment toward Baton Rouge, *the right rear wheel on the trailer broke off, and was lost in the swamp?* " (Emphasis added.)

And Urban replied: "That's right."

Subsequently, in the 24th cross-interrogatory, he was asked: "Isn't it a fact that after the right rear wheel on the trailer broke off, the inside right rear tire on the trailer blew out?"

Urban's reply was: "That's right: the weight of the truck blowed it out."

The purpose of Urban's statement that a wheel had not broken off, and that the truck was on wheels on all sides, was apparently an attempt to show that the truck was not in fact disabled and not unable to move under its own power. It is significant, however, that the witness was not asked why, if this were true, he permitted the truck to remain on the highway instead of moving it on to the shoulder of the road. Urban's original testimony that the wheel had come off of the truck is corroborated by the testimony of Fred Bahlinger, who testified that on the night of the accident while en route from New Orleans to Baton Rouge he carried a message to the truck driver; that he was informed that the truck had broken down,—had had some wheel trouble; that he was to tell the driver endeavors were being made to get the proper wheel, and that it would be sent to him, the truck driver, as soon as possible. Urban's original testimony in this respect is also corroborated by the mechanic, Albert P. Hickman, who went to the scene to repair the truck. Hickman testified that when he reached the truck it was impossible to move it under its own power because the axle and the hub of the wheel of the trailer were on the ground, and that the tractor did not have power enough to move it on the concrete.

In view of the positive, unequivocal answers which Urban gave in reply to the interrogatories and cross-interrogatories, and of the corroborative testimony, it seems obvious that no weight should now be given to his affidavit, which quite clearly was made out of a desire to assist plaintiff.

Turning now to the affidavit of George Walker, comparison discloses that, to the extent that its contents, if testified to, would be admissible in evidence, it is substantially in accordance with the testimony given by him at the trial. However, much of the affidavit is given over to conjecture, speculation, conclusions and opinions which would not be legal evidence. For example, Walker discusses and reviews Urban's affidavit which he states he has read. Then from Urban's affidavit and Walker's own appreciation of the facts Walker draws conclusions which are nothing more than conjecture and opinions, as to what he would or would not have been able to see or do if he had been in Thibaut's place.

Lawrence Lambert executed a typewritten affidavit on March 13, 1948, a little more than three years after the accident, in which he repeats substantially his testimony at the trial. However, added to the typewritten affidavit and executed also on March 13, 1948, is one written in longhand. In the handwritten affidavit, Lambert claims to have read Urban's affidavit which was executed seven months before, and states that it is true, "according to what I found at the scene of the accident." Lambert specifically states that the wheel was not off of the right rear side of the trailer up to the time he left the scene, after the accident. Lambert gave not a line of testimony to this effect on the trial, and it is interesting to note that here, again, plaintiff's counsel, who took the affidavit, failed to ask the affiant why, if the vehicle was not disabled, it was permitted to remain on the highway after the accident, instead of being driven onto the shoulder. Lambert's statement is simply unbelievable in the face of the evidence to the contrary. The remainder of the handwritten affidavit deals in opinions and conjecture, clearly inadmissible.

Leslie Bourque repeats in his affidavit some of the testimony which he gave on the trial. For the first time, however, he states that he made a close examination of the truck and the trailer on the night of the accident; that he is positive that up to the time that he left the scene no wheel was missing from the trailer, and that the trailer was on wheels on all sides. At the trial of the case there was not a whisper of testimony by Bourque to this effect. Bourque

explains this by stating that he did not know during the trial that there was testimony to the effect that a wheel had blown off and that the other tire on the dual wheels on the right rear had blown out; that he had been placed under the rule, and, for that reason, had not had an opportunity to hear the other witnesses. Conceding that Bourque was excluded from the court-room, plaintiff's counsel were in the court-room. They knew what the testimony in the case was, and although Bourque testified not only in chief but also in rebuttal, he was never asked any questions on the witness stand concerning the truck's wheels and tires. It is extremely significant that although Bourque is and was at the time of the accident a peace officer and was at the scene in his official capacity, his testimony is that when he left the scene of the accident the truck and trailer were still on the highway, where they were at the time of the accident. If the vehicle was not immobile, the question naturally arises as to why Bourque did not, in his capacity as a state police officer, see to it that it was removed from the highway onto the shoulder on the left side of the road, which, at that point, is wide enough to accommodate at some future time a two-lane strip of roadway. Nor did plaintiff's counsel ask him this question. It is entirely unreasonable to believe that any jury would accept Bourque's statements as being true.

Bourque's affidavit, too, contains a discussion of Urban's statement, with inadmissible conclusions, conjecture, and opinions of the character referred to in the discussion of Walker's and Lambert's affidavits.

This brings us to the statement of Mrs. Wright Gautreaux, who did not testify on the trial. She states that she arrived at the scene of the accident between an hour and a half and two hours after the accident had occurred. How she knows, except by hearsay, the time which had elapsed is difficult to understand. But, be that as it may, the accident occurred about midnight, and assuming that she is correct, she was there at about half-past one or two o'clock in the morning. She states that she looked at the tractor and trailer, and noticed in particular that there were no wheels and no portion of a wheel off of any part of the equipment. Why this lady, who apparently is not a mechanic and who presumably had no particular interest in the matter, should have gone to the scene during the early morning hours and made it such a special point to closely examine the equipment is beyond comprehension. It is equally incomprehensible why this feature should have made such a profound impression upon her that she, as she claims she did, should have told another person, the following day, that someone had removed the wheels from the right rear part of the trailer.

Her affidavit standing alone is incredible; viewed in the light of reason and of the overwhelming evidence to the contrary, it becomes utterly unbelievable, and to conclude that a jury might give it credence would be entirely unreasonable.

■■ Certainly, in deciding the question here involved, this court is not required to believe the statements filed merely because the persons making them have had the nerve to swear to them. The affidavits fall far short of showing that other evidence is available that might reasonably change the result reached by the Circuit Court.

The facts of this case are as Judge McCord found them to be. They disclose that the truck and trailer were disabled on the highway; that flares were placed in front of the truck and to the rear of the trailer; that Thibaut was travelling on the highway at a very high rate of speed; and, as aptly stated by Judge McCord [161 F.2d 658], "* * * that he either did not keep a proper lookout and did not see what he should have seen in the highway before him, or that he did not have his car under such control as to be able to stop within the range of his vision."

Plaintiff has cited and relies heavily on the case of Lee Roy Dodge v. Bituminous Casualty Corporation, 1949, 214 La. 1031, 39 So.2d 720. Without discussing that case, I cannot see how plaintiff is helped by it. It did not change the law of this state. The rule is as it was when Judge McCord wrote the opinion of the appellate court in this case.

Plaintiff having failed to meet the condition laid down by the Court of Appeals for the granting of a new trial, judgment will, in accordance with that Court's mandate, be entered for the defendant.